IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| In re <br><br>     STEVE ZIMMER PAIGE, <br>    Debtor <br><br> SEARCH MARKET DIRECT, INC. and STEPHAN S. MAY <br>    Appellants, <br><br>       vs. <br><br><br> GARY JUBBER, Liquidating Trustee, and CONSUMERINFO.COM, INC., <br><br><br>     Appellees. | **OPINION** <br><br><br><br><br><br> Case No. 2:09-CV-988-DB <br><br> On appeal from a Final Judgment of the United States Bankruptcy Court for the District of Utah, Adv. No. 06-02299 |

      Before the court are three separate items for review including: 1) Defendants/Appellants'

appeal from a judgment entered by the Bankruptcy Court awarding the domain name

Freecreditscore.com to Appellees; 2) Plaintiffs/Appellees' cross-appeal of the denial of damages;

and 3) Plaintiffs/Appellees' Joint Suggestion of Mootness. Having both an appeal and a motion

to render that appeal moot pending places this court in unique position.  If the appeal is moot,

there is no need to address the underlying merits of the appeal.  However, the Joint Suggestion of

Mootness and the cross-appeal arise out of the same operative facts as the appeal, and both

require an exhaustive review of the record and subsequent material. For these reasons, and in the interest of judicial economy, this court will address all three items. This court's decision concerning the appeal is meant to be an alternative theory for affirming the Bankruptcy Court's conclusions in the event that this court's finding of mootness is invalidated.

The appeal's Introduction and Background sections and the terms defined therein have been incorporated and used in both the cross-appeal and suggestion of mootness.

# 1.  APPEAL

### INTRODUCTION

This is an appeal from a judgment ("Judgment") entered in favor of Appellees by the United States Bankruptcy Court for the District of Utah ("Bankruptcy Court") and a related detailed, sixty-four page memorandum decision ("Memorandum Decision") issued by the Bankruptcy Court. The Judgment concerned the ownership of and right to use the internet domain name, freecreditscore.com ("Domain Name").

This appeal centers on a hotly contested adversary proceeding ("Adversary Proceeding" or "AP") that included 19 days of trial spanning a period of eight months.[1] The appellants in this matter, Search Market Direct, Inc. and Stephan May (collectively "Appellants"), were, in addition to others, the defendants in the underlying Adversary Proceeding. The appellees are Gary Jubber, the liquidating trustee ("Trustee"), and Consumerinfo.com ("CIC") (collectively "Appellees"). Appellees, acting as plaintiffs in the Adversary Proceeding, commenced suit against Appellants seeking to recover, among other things, the Domain Name.[2]

---

[1] *Brief of Appellants* at 5.
[2] *In re Steve Zimmer Paige, Memorandum Decision* [Doc. 461] (Aplt. App. 1-66), at 1.

In the Memorandum Decision, the Bankruptcy Court stated that, aside from preliminary matters involving the parties' standing and the applicable standard of proof, the central issue before the court is whether the Domain Name was owned by the Debtor Steve Paige ("Paige" or "Debtor") at the time of the relevant pre-petition and post-petition transfers, or by Paige's business Consumer Credit Services, LLC ("CCS, LLC").[3]  For the reasons stated herein, the decision of the Bankruptcy Court is **AFFIRMED.**

## BACKGROUND

The Adversary Proceeding involved a number of complex factual and legal issues that required an extensive trial.  Additionally, both parties were, and continue to be, represented by capable and committed counsel.  The combination of complex issues and capable counsel has created a rather voluminous evidentiary and trial record.  Additionally, this court indulged both parties by agreeing to the filing of over-length briefs.  After carefully considering the factual findings put forth by the Bankruptcy Court and the subsequent interpretation of those facts by both parties, this court has concluded that, in large part, the Bankruptcy Court's factual findings are accurate.  Thus, the majority of this background section (and portions of the discussion section) adopts portions of the Memorandum Decision's findings.  To the extent that this court disagrees with the Bankruptcy Court, it will be noted in the Discussion section.

In May 2000, Paige acquired the Domain Name and registered it in his own personal name with Network Solutions, Inc. ("Network Solutions"), a domain registrar company.  In addition to being listed as the registrant of the Domain Name by Network Solutions, Paige was

---

[3] *In re Steve Zimmer Paige, Memorandum Decision* [Doc. 461] (Aplt. App. 1-66), at 2.

also listed as the technical, administrative, and billing contact for the Domain Name. As part of the Domain Name's initial registration, Paige paid $70 to Network Solutions with his personal credit card to cover the Domain Name registration fee for May 3, 2000 through May 3, 2003.

On August 19, 2002, Paige formed CCS, LLC, which was engaged in the business of providing services to consumers to improve their personal credit scores. The Articles of Organization for CCS, LLC show that Paige and the Liahona Trust were its only members. Prior to CCS, LLC's formation, Paige owned a company called CCS Financial, Inc. ("CCS Financial"), which also provided credit repair services to consumers.

On May 2, 2003, Paige paid $75 to renew the Domain Name registration with Network Solutions for another three years. As with the initial registration fee, Paige paid the renewal fee with his personal credit card. Although CCS, LLC reimbursed Paige for the registration fee, the evidence shows that CCS, LLC paid the entire credit card bill that contained not only the registration fee but other personal and business expenses.

In or around September 2004, Paige entered into a joint venture with Citizens Credit Bureau, Inc. ("CCB"), which used the Domain Name to direct internet traffic to a web page entitled "FreeCreditScore.com" in order to generate client leads for CCB and/or the CCS entities. The Domain Name was used by the joint venture until approximately mid-January 2005. Throughout this period, Paige was the registered owner and the administrative and billing contact for the Domain Name, but the technical contact had changed from Paige to Thomas Gazelle ("Gazelle") of Real Tours, Inc. ("Real Tours") in December 2003.

Sometime in January 2005, Paige began working on a different joint venture with Colt Investment Group, LLC ("Colt"). On January 13, 2005, a Term Sheet was executed between "Consumer Credit Services, LLC, AKA, CCS Financial" as "Seller" and Colt as "Buyer" (the "Term Sheet"). The Term Sheet was signed by Tali Haleua ("Haleua") on behalf of the Buyer "Colt Technologies, LLC," and by Allene Paige ("Allene"), Steve Paige and Lee Price ("Price") on behalf of the Seller. Upon the execution of the Term Sheet, the assets of the Seller were to be conveyed and transferred to the Buyer. The Term Sheet did not specify the assets to be transferred or whether they included the Domain Name.

Shortly after the Term Sheet was signed, Paige, CCS, LLC, Price, Allene, and Liahona Foundation, as Sellers, and Colt, as Buyer, entered into an Agreement of Purchase and Sale of Assets ("Colt APA"). Under the Colt APA, executed on January 17, 2005, the Sellers agreed to sell all of the business assets of CCS, LLC (but not CCS, LLC itself). The Colt APA was signed by Paige individually and as "Managing Member of [CCS, LLC];" Allene individually and as "Manager of Liahona Foundation;" Price individually; Haleua as "Managing Member of Colt Investment Group, LLC;" and John Smart as "Trustee of Liahona Foundation." CCS Financial was not mentioned anywhere in the Colt APA nor was it a signatory to the agreement.

Although the Colt APA made no specific reference to the Domain Name, Haleua had learned through his investigation that Paige held the Domain Name in his individual name and also understood that Paige owned CCS, LLC and CCS Financial. As of April 1, 2005, Paige was the registered owner of the Domain Name and the "WHOIS Billing Contact" in the Network Solutions records, but the "Primary Administrative Contact," the "WHOIS Administrative

Contact," the "WHOIS Technical Contact," and the "Billing Contact" were changed to Randy Conklin ("Conklin") of Colt. Conklin, a defendant in this case, was an employee of Colt and acted under Haleua's and Paige's direction when he made changes to the Domain Name registration in the Network Solutions records.

Paige remained the registered owner of the Domain Name (also referred to as the registrant) until June 14, 2005, when the registrant changed from Paige to Conklin. Although Conklin was listed as the registrant through the petition date and until November 24, 2005, he denies ever having ownership rights to the Domain Name. Initially he believed that he held it for Haleua, but after the separation discussed below, Conklin testified that he was holding it for Paige and was to transfer it back to him unless directed otherwise.

By July 2005, the relationship between Paige and Colt's principals became strained, and the parties decided to separate. On July 18, 2005, two months before Paige filed for bankruptcy, Haleua, Paige, Allene, and Price, as "members of CCS Financial, and/or Colt Credit Services, LLC," entered into a Separation Agreement (the "Colt Separation Agreement") pursuant to which Haleua and Colt agreed to transfer "all of their interest, equity, and ownership [of CCS Financial] to CCS Financial, Steve and Allene." Among the reimbursements that Haleua and Colt agreed to make to CCS Financial were the "title of all Internet URL's to be transferred and conveyed back to CCS, (freecreditscore.com, getyourscore.com, getyourcredit.com, improveyourscore.com)."

After the separation with Colt, Paige began to explore other options to realize value for himself and his companies through the sale of the Domain Name and other business assets.

Around August 2005, Paige entered into discussions with Chad Sayers ("Sayers"), the president of PSNet Communications, Inc. ("PSNet"), regarding a potential joint venture or a merger of CCS entities with PSNet. Before these negotiations materialized into a formal agreement, however, Paige filed for chapter 7 bankruptcy relief on September 16, 2005, and Gary Jubber was appointed as the chapter 7 trustee. At the time, Paige was the sole owner of CCS, LLC. Although he listed his ownership interests in CCS, LLC and CCS Financial in his bankruptcy statements and schedules, he did not list the Domain Name or his tax debts in his statements and schedules.

After his bankruptcy filing, Paige continued his negotiations with Sayers for the sale of CCS assets to PSNet. Both Sayers and Neil Crabtree ("Crabtree"), a legal consultant for PSNet, knew of Paige's bankruptcy at the time Sayers engaged in negotiations with him. Sometime between September and October 2005, Paige moved CCS operations into PSNet's offices.

Around this same time, Paige also engaged in discussions with May and his company, SMDI, and others regarding the sale of the Domain Name. May had expressed interest in the Domain Name in the past and had contacted Paige about purchasing it in 2001. At that time he determined that Paige owned the Domain Name by conducting a WHOIS search and had kept Paige's contact information. On October 19, 2005, May sent Paige an email inquiring whether Paige still owned the Domain Name and whether he was interested in selling it. A telephone call followed between May and Paige wherein Paige offered to sell the Domain Name together with a credit score algorithm (also referred to as a "FICO calculator") for $1 million. As May did not have a million dollars at the time, he explored other possible business arrangements with Paige.

On November 3, 2005, May traveled from California to Utah to meet Paige regarding the potential purchase of the Domain Name. The next day, May sent an email to Paige memorializing their preliminary agreement for a two-part arrangement whereby May would purchase the Domain Name from Paige for $140,000 and would pay him competitive royalties for using his "credit scoring model" in the products developed by May's business. Following the meeting in Utah, May set up an escrow through Escrow.com to facilitate the transfer of the Domain Name. On November 7, 2005, Paige sent an email to May asking him to put together an agreement outlining the terms of the Domain Name sale that would include, among other things, the following language: "should the event fee structure fall overdue 90+ days the domain name will be returned to me."

May and Paige continued to discuss and negotiate the terms of their agreement over the course of several days and scheduled another meeting in Utah on November 11, 2005. While these negotiations were taking place, Paige sent an email to his friend Stephen Taylor ("Taylor") stating: "I am selling an $8.00 domain name for $140,000 plus I can get a residual on all sales and can use the leads for CCS." The Bankruptcy Court found that this email showed that Paige considered himself as the owner of the Domain Name and expected to keep the monetary proceeds from the sale of the Domain Name for himself.

On November 11, 2005, May met with Paige for the second time. The meeting was also attended by Brennan Scott ("Scott"), Appellant SDMI's employee who was to review the technical matters relating to the use of the FICO calculator, and Sayers who attended only part of the meeting. Paige and May did most of the talking at that meeting. During the first meeting,

May was informed that CCS was going to merge with PSNet, and when May came to the second meeting he brought with him a cashier's check for $140,000 made out to PSNet.

On November 12, 2005, May sent Paige an email offering to purchase the Domain Name for $225,000 "no strings attached." He indicated that once he received the Domain Name, he would fly to Salt Lake City and hand Paige the $225,000 "in cash" and that Paige could do whatever he wanted with the funds. May further stated that he would not work with PSNet and Sayers. Numerous phone calls took place between May and Paige over the next few days.

On November 15, 2005, Paige replied to May's offer stating that May's proposal was "too risky" and explained that PSNet had to be part of the transaction to "protect" him." At trial, Paige testified that what he meant by this phrase was that he believed he could trust Sayers and wanted him involved to look out for CCS's interests. At the time that the statement was made, however, there was no formal offer or agreement with PSNet regarding the sale of CCS assets and/or the Domain Name. Moreover, in his earlier testimony Paige stated that he did not intend to sell the CCS assets or the Domain Name to PSNet.

On November 16, 2005, after several telephone and email discussions with Paige regarding the terms of the sale, May sent an email to Paige stating "I agree to purchase www.freecreditscore.com for the sum of $225,000 US from Steve Paige." Nevertheless, after conducting a WHOIS search several days later, May discovered that Conklin was listed as the administrator for the Domain Name. On November 21, 2005, believing that he had been the subject of misrepresentations by Paige as to the ownership of the Domain Name, May informed

Paige that the agreement was canceled. At the same time, believing Conklin to be the legitimate owner of the Domain Name, May offered to purchase it from Conklin for $140,000.

After receiving May's email canceling the Paige transaction, Paige immediately undertook efforts to regain May's confidence and the prospective sale. Paige arranged for a copy of the Colt Separation Agreement to be faxed to May, which was received by May on November 21, 2005. That same day, PSNet as "Buyer" and "CCS Financial, LLC" and CCS, LLC as "Seller" entered into an Asset Purchase Agreement ("PSNet APA") in which PSNet agreed to purchase all of the assets and property of the "Seller," including "all intellectual property . . . and any additional credit related assets and/or software public or proprietary owned by the Seller, Steve Paige or their associates including the internet domain name 'freecreditscore.com.'" The PSNet APA was only signed by Chad Sayers as "President" of PSNet and Steve Paige as "Managing Member" of "CCS Financial, LLC/Consumer Credit Services, LLC." Paige individually was not a party to the PSNet APA because he neither signed it nor was he named as a seller. Similarly, CCS Financial (which is not the same entity as "CCS Financial, LLC") was also not a party to the agreement.

May was not given a copy of the PSNet APA but was told by Paige that PSNet had purchased CCS's assets. Based on his review of the Colt Separation Agreement and the representations made by Paige and Crabtree regarding the ownership of the Domain Name, May believed that the Domain Name belonged to Paige and resumed his negotiations with him. By the end of the day on November 21, 2005, Paige and May were again exchanging emails regarding the proposed sale. Shortly thereafter, Sayers contacted Conklin to obtain the necessary username and password to change the registrant information in Network Solutions' records. On November

24, 2005, the Domain Name registrant was changed from Conklin to Sayers. Networks Solutions'

records were also amended to show Sayers and then PSNet as the administrative contact.

May and Paige continued their negotiations for the sale of the Domain Name until the end

of December 2005. In his discussions with Paige, May also included Sayers who May understood

to be the president of PSNet. For PSNet, an important aspect of the proposed transaction was

reaching an agreement for a long-term relationship between PSNet and May's company for the

cross-promotion of consumer credit services. May, on the other hand, wanted his company,

SMDI, to own rights to the Domain Name free and clear, and if there was to be a continuing

relationship with PSNet, he wanted the ability to opt out of it for a cash payment.

Despite being aware of the PSNet-CCS merger and having engaged in some discussions

with Sayers, May continued to view the Domain Name as Paige's personal asset. On December

6, 2005, May sent an email to Paige offering again to purchase the Domain Name for $225,000

from Paige directly, without any mention of CCS or PSNet. May admitted that at the time of this

email he was trying to acquire the Domain Name without Sayers' and PSNet's involvement.

Over the next couple of days, May and Sayers exchanged several emails wherein Sayers

wanted a commitment from May that he would promote PSNet's business and would provide

PSNet leads from the use of the Domain Name. In one email to Sayers, with a copy to Paige and

Scott, May expressed his concern about the Domain Name's ownership, stating "[p]lease

understand that with all the problems with the clear ownership of the domain freecreditscore.com

that the . . . credit repair leads commitment will not be valid until freecreditscore.com is in my

control and I receive a notarized document signing off title and ownership of the domain to either

PSNet, Chad Sayers, or Steve Paige." At this point, May believed that any one of these individuals/entities could have owned the Domain Name but, in any event, it was not CCS.

As the negotiations between May, Paige, and Sayers continued, the United States Trustee ("U.S. Trustee") filed a Motion to Extend Time to Oppose Discharge in the Main Bankruptcy Case on December 19, 2005. In the motion, the U.S. Trustee stated that it was contacted "by an anonymous source regarding concerns with the Debtor's Statement of Financial Affairs and Schedules, and specifically undisclosed assets of the estate." Paige was served with the motion on January 24, 2006.

The loan transaction between Sayers and Mark Timothy ("Timothy"), another defendant in this case, should be addressed at this juncture. In addition to his credit repair business, Sayers was also involved in residential acquisitions in Las Vegas and reportedly needed a loan to close some house deals. On or around December 19, 2005, Sayers, through Crabtree, approached Timothy to borrow $9,000. Originally, the loan was to be secured by a truck. However, Crabtree told Timothy that Sayers/PSNet owned the Domain Name and advised Timothy that he could take it as collateral for the loan as well as use the Domain Name to secure repayment of previously loaned amounts. It appears that in addition to the $9,000 loan, Sayers may have owed Timothy more on prior loans and obligations. Timothy asked Crabtree, who had graduated from law school in 2004 but was never admitted to the bar, to draft an agreement memorializing the terms of the loan transaction.

On December 19, 2005, Crabtree emailed Sayers the terms of the proposed loan agreement, which stated that Sayers and/or PSNet would "assign the URL 'freecreditscore.com'

to [Timothy] as collateral" for a $22,000 loan to be repaid "on or before December 28, 2005. Sayers and/or PSNet further agreed "to provide [Timothy] the username and passwords to the [Domain Name], so that [Timothy] may access it and have control and all right of ownership, if the [loan] is not paid in full by the due date . . . ." The loan amount was apportioned as follows: $9,000 would be given at the time of the signing of the loan agreement; $8,000 was allegedly for a prior loan made by Timothy to PSNet; $3,000 was for interest; and $2,000 was allegedly an amount Sayers owed to Crabtree. On December 20, 2005, Sayers, without Paige's authorization or knowledge, agreed to the terms of the loan agreement, and gave Timothy the username and passwords to the Domain Name. Around the same time, PSNet issued three checks in favor of Timothy totaling $21,000, to be applied towards Timothy's loan. Timothy cashed one of the checks in the amount of $11,000 on January 3, 2006, and that same day wrote a check to Crabtree for $2,000.

On December 21, 2005, the communications between Sayers, May and Paige resumed. May sent an email to Sayers, with a copy to Paige, stating that he needed to have a written agreement in place for the sale by December 28; otherwise, the deal was off. Sayers replied with a less than cordial email expressing his distrust of May and noting that while Paige may need the money, PSNet does not and that it owns the Domain Name. Sayers then counter-offered with $275,000, which May rejected in a subsequent email. On December 22, 2005, May sent another email to Sayers, with a copy to Paige, offering to purchase the Domain Name "straight up" for $225,000 and reiterating his concerns about the ownership. The negotiations between May, Paige

and Sayers towards the end of December 2005 ended on less than cordial terms, especially between May and Sayers.

In December 2005, the Trustee learned, for the first time, that Paige had not disclosed certain assets in his bankruptcy schedules from an email by an anonymous tipster who identified himself to the Trustee only as THIRSTY 4 JUSTICE. Following up on the anonymous tip, the Trustee sent a letter to Escrow.com on January 4, 2006, notifying it of Paige's interest in the Domain Name, and advising that the Domain Name was property of the bankruptcy estate and could not be sold without court approval. That same day, Sayers forwarded to Paige an email that Sayers received from Enderton a bankruptcy lawyer, which stated that the U.S. Trustee was seeking an extension of time to object to Paige's discharge based on the information that the U.S. Trustee had received from an anonymous source regarding certain undisclosed assets. Enderton further cautioned Sayers that this could relate to an asset that Sayers was looking to purchase, presumably referring to the Domain Name. Sayers sent a follow-up email to Paige, stating: "[f]or your sake it is a good thing that we did not sell the domain. Now the trustee will be looking for things and may well investigate you AND PSNet and that annoys the crap out of me!" At the time of these emails, Paige was unaware that Sayers/PSNet had pledged the Domain Name as collateral for a loan.

On January 6, 2006, Timothy, with the help of Charles Schmidt (aka Steve Cantano) ("Schmidt"), a Las Vegas resident with experience in marketing domain names, changed the Domain Name registration from PSNet to Promarketing Network, Inc. ("Promarketing"), one of Timothy's companies, without Paige's knowledge or consent. Timothy knew of Paige's claim to

the Domain Name prior to January 6, 2006, both through his own research and from his discussions with Sayers and Crabtree. He was also aware of Paige's personal bankruptcy when he asked Schmidt to transfer the Domain Name from PSNet to Promarketing.

Immediately after taking the Domain Name, Timothy, with Schmidt's help, began marketing the Domain Name for sale. Schmidt testified that Timothy told him to "liquidate" the Domain Name as quickly as possible for whatever he could get for it.

On January 10, 2006, an employee of Appellant SMDI named Scott received an email from "Disgruntled" at "Ad Honcho" informing him that the Domain Name was back with its "true owner" and that it was "for Sale to Someone Real." Scott shared this email with May who did not recognize the sender but believed it to be Sayers. After conducting a WHOIS search, May learned that Promarketing was purporting to be the registered owner. On January 12, 2006, using the contact information in the WHOIS records, May emailed Promarketing to inquire whether the Domain Name was, in fact, for sale. Schmidt, using the alias Steve Cantano, responded to May informing him that bids were being accepted until "Wednesday, Jan. 13th," and that May could participate in the auction by executing a non-disclosure agreement ("NDA"). Schmidt subsequently clarified that the reference to the "13th" was a "typo" and that the bidding deadline was the 18th.

Between January 14 and 17, 2006, May communicated with Schmidt several times via email, facsimile, and telephone, seeking clarification as to the ownership of the Domain Name and how Timothy/Promarketing acquired it. May indicated to Schmidt that he was aware of several changes in the Domain Name over the past several months, stating: "I have talked to

several people late last year who claim they have ownership/control of the Domain Name, therefore a very confusing situation."  He also requested that Schmidt disclose his role in the auction.  Schmidt responded that he would address May's concerns after he received the signed NDA.  May immediately signed and returned the NDA to Schmidt and again requested clarification regarding the ownership.

While waiting for a response from Schmidt, May contacted Paige and informed him that May intended to participate in an auction to purchase the Domain Name and asked whether he could submit his bid on January 18, 2006.  Paige told May that he knew nothing about the auction and that the Domain Name should not be for sale.

After the phone call with Paige, May was contacted by Schmidt who told May that Timothy owned Promarketing, that Schmidt was assisting Timothy with the Domain Name sale, and that Timothy got the Domain Name from Sayers as collateral for an unpaid debt.  Shortly after this phone call, May sent an email to Schmidt asking for a short history of changes in the Domain Name's ownership.  May also asked for a written certification from Timothy that he owned the Domain Name free and clear of any liens.  Schmidt assured May that he and Timothy would provide him with the requested information, and based on these assurances May submitted a bid to purchase the Domain Name from Timothy for $350,000 on January 17, 2006.  Timothy accepted May's offer that same day.

As the communications between May and Schmidt continued, Paige contacted his then lawyer, Lonnie Eliason ("Eliason"), about making a demand on PSNet to return the Domain Name.  On January 17, 2006, Eliason, based on the information provided to him by Paige, sent a

letter to Sayers demanding that he immediately return the Domain Name to "CCS, LLC." Although the letter requested that the Domain Name be returned to "CCS, LLC," Paige later acknowledged at his meeting of creditors that it was, in fact, to be put back in his name because he, not CCS, owned the Domain Name. This is consistent with the last paragraph of the letter, which stated that "these items [referring to the Domain Name and other domain names] are all part of the bankruptcy estate." The letter also stated that "[a]t no time has Mr. Paige approved of any transfer of this name to any third party." Sayers acknowledged that as of the date of this letter, he had no ownership interest in the Domain Name, that he was not authorized to transfer it to anyone else, and that he was to put it back in Paige's name.

The Bankruptcy Court found this letter helpful and relied on it in finding that both Paige and Sayers believed that the Domain Name was Paige's personal asset and, therefore, property of the estate. The Court further noted that at the time the Eliason letter was sent, Paige was aware that his discharge was being delayed and that the Trustee/U.S. Trustee was investigating his bankruptcy filing, and with this letter, he wanted to ensure that in the event the Trustee discovered this transfer, he would be cleared of any non-disclosure of the Domain Name and any other wrongdoing.

Between January 17 and January 18, 2006, May had several phone conversations with Timothy regarding the latter's involvement with the Domain Name. During these phone calls, Timothy purportedly told May that he received the Domain Name as consideration for a loan he made to Sayers. Both Timothy and May testified that Timothy did not disclose the amount that Sayers owed to him. Timothy subsequently executed a sworn statement of Representations and

Warranties that May had provided certifying Timothy's ownership of the Domain Name. May, however, never received the history of changes to the Domain Name ownership that he requested. On January 18, 2006, May proceeded forward with the purchase through Escrow.com, and transferred the Domain Name's registration into his name, and then to SMDI's once the sale closed. After SMDI acquired the Domain Name, it licensed its use to Magnet Media, Inc. ("Magnet Media"), another company owed by May. Within a week of the Domain Name's purchase, Magnet Media began generating significant daily revenues from its use of the Domain Name.

Before the denial of discharge action was commenced, the U.S. Trustee and Jubber examined Paige over the course of two days pursuant to a Rule 2004 examination. This examination occurred after Jubber received the anonymous email from THIRSTY 4 JUSTICE tipping him off that there was an undisclosed domain name in Paige's estate. In that examination, Paige described the Domain Name as "his domain name," implying that it was his personal asset.

On February 8, 2006, the Court entered an order extending the deadline for filing complaints concerning Paige's discharge, extending the time to file a motion to dismiss or a complaint through and including March 20, 2006. In the meantime, the Trustee sought retrieval of the Domain Name from May. When May and SMDI refused to turn over the Domain Name, the Trustee commenced this Adversary Proceeding to recover it and for other related relief, including declaratory relief that the Domain Name was property of the estate as of the Petition Date. On May 19, 2006, the U.S. Trustee commenced an adversary proceeding against Paige to

deny his discharge under 11 U.S.C. § 727 for failure to disclose the Domain Name and false oaths (the "Denial of Discharge Action").

On September 16, 2006, while the Adversary Proceedings were ongoing, Paige was questioned by one of May/SMDI's attorneys regarding the ownership of the Domain Name and the meaning of the phrase "back to CCS" in the Colt Separation Agreement (the "September 2006 meeting"). During extensive questioning by one of SMDI's attorneys, Paige explained that the phrase "back to CCS" meant back to him personally and gave clear and detailed reasons in support of that statement. When asked whether there was any factual basis for the claim that CCS, LLC or CCS Financial owned the Domain Name, Paige replied: "No. And let me tell you why I come to that conclusion. Because I bought the domain name under Steve Paige. I didn't buy it under CCS. It came out of my personal account. It didn't come out of CCS, it came out of my credit card." Paige also clarified that he did not authorize the transfer of the Domain Name to Sayers/PSNet, and when he demanded that Sayers return it, he intended for it to go back to him rather than CCS.

On October 6, 2006, Paige retained counsel, and sought and obtained conversion of his case from chapter 7 to chapter 11. Jubber immediately moved to reconvert the case to chapter 7, but the Bankruptcy Court denied his motion. Instead, the Bankruptcy Court ordered the appointment of a chapter 11 trustee, and Jubber was appointed to serve in that capacity.

After the case was converted to chapter 11, the Trustee filed a motion to approve the sale of the Domain Name and related assets, including a co-interest in the Adversary Proceeding to ConsumerInfo. SMDI submitted a competing bid in the form of settlement offers and objected to

the proposed sale to ConsumerInfo.  In response, ConsumerInfo modified its original offer to provide for payment of $1.9 million in cash plus a commitment to fund up to $200,000 of additional litigation expenses.

After conducting a hearing on the Trustee's motion to sell, the Court issued a detailed Memorandum Decision granting the motion.  The Court subsequently entered an Order Authorizing Sale of Domain Name Related Assets (the "Sale Order") on December 12, 2006. The Sale Order, among other things, approved the Asset Purchase Agreement between the Trustee and ConsumerInfo (the "ConsumerInfo APA"), which provided for the sale of all of the estate's rights related to the Domain Name.  The Sale Order was not appealed.  Pursuant to the ConsumerInfo APA, ConsumerInfo paid $1.9 million to the estate plus $200,000 for litigation expenses related to the Adversary Proceeding at the initial closing.  Under the ConsumerInfo APA and the Sale Order, ConsumerInfo was granted a co-interest in the Adversary Proceeding and a 25% interest in the net monetary recoveries obtained by the Trustee. Additionally, the ConsumerInfo APA required that the Trustee prosecute the Adversary Proceeding in good faith, and if the Trustee was successful in proving that the Domain Name was property of the estate, or otherwise recovered the Domain Name, he would be required to deliver the Domain Name to ConsumerInfo.  The ConsumerInfo APA did not contemplate delivery of value of the Domain Name in lieu of returning the Domain Name.  However, the Trustee did seek damages in addition to the return of the Domain Name.

After the Bankruptcy Court approved the ConsumerInfo APA, ConsumerInfo purchased CCB claims, and, thereafter, filed claim 42 with the Bankruptcy Court.  Claim 42 asserted a

general unsecured claim against the estate in the amount of at least $2.1 million. Claim 42 was premised on the theory that Paige had converted the Domain Name from CCB. The SMDI Defendants also introduced the testimony of Rick Anderson and others to show that CCB Data and not Paige owned the Domain Name prior to Paige's bankruptcy filing.

On May 23, 2007, SMDI proposed a chapter 11 plan (the "SMDI Plan"), and the Trustee and ConsumerInfo proposed a joint, competing plan (the "Joint Plan"). The Bankruptcy Court conducted a seven-day trial on confirmation of both plans and subsequently confirmed the Joint Plan on October 18, 2008 ("Confirmation Order"). Under the Joint Plan, the Adversary Proceeding vested in a liquidating trust (the "Liquidating Trust"), and Jubber became the Liquidating and the Plan Trustee. As of the confirmation date, there were substantial unpaid claims held by multiple creditors. All allowed, undisputed claims were paid under the Joint Plan. As previously stated, the Joint Plan provided for the continued prosecution of the Adversary Proceeding. However, additional funding beyond what the estate had on hand from the sale was necessary to prosecute the Adversary Proceeding and to pay the creditors in full. In consideration of the terms of the Joint Plan and the Liquidating Trust, ConsumerInfo agreed to pay several hundred thousand dollars more to the estate and to subordinate its CCB claim. The Bankruptcy Court found that the payment of claims pursuant to the Joint Plan constituted a benefit to the estate and the creditors.

The Trustee also objected to various proofs of claims and reconciled tax claim amounts. Certain third-party creditors, such as the taxing authorities, were paid well after the effective date of the Joint Plan, as were certain chapter 11 administrative claims. The claims of PSNet, which

are disputed, and ConsumerInfo appear to remain unpaid. The Joint Plan was substantially consummated.

On June 30, 2006, Appellants filed a motion to dismiss the Adversary Proceeding. After some delay, that motion was withdrawn, and they filed their first answer to the original complaint in the Adversary Proceeding.

In May 2007, Appellants filed another motion to dismiss the Adversary Proceeding for failure to join ConsumerInfo as a defendant, arguing that ConsumerInfo was a necessary party because its competing claim to ownership of the Domain Name was adverse to that of SMDI and the estate. After a hearing, the Court granted Appellants' motion and ordered that ConsumerInfo be joined as a defendant; otherwise, the Adversary Proceeding would be dismissed. After the Court's ruling, ConsumerInfo waived its claim to ownership of the Domain Name as against the estate. Thereafter, the Trustee filed a Motion to Stay, or in the Alternative, Amend Ruling Regarding SMDI's Rule 12(b)(7) Motion, and sought permission to join ConsumerInfo as plaintiff.

On July 5, 2007, the Bankruptcy Court granted the Trustee's motion and ordered ConsumerInfo joined as a party plaintiff. Shortly thereafter, the Trustee and ConsumerInfo, as co-plaintiffs, filed the first Amended Complaint on July 16, 2007. In the Amended Complaint, the Plaintiffs, among other things, sought declaratory relief that the Domain Name was property of the estate on the Petition Date as well as pre- and post-petition, and asserted that the post-petition transfers of the Domain Name violated the automatic stay or, alternatively, constituted avoidable unauthorized transfers under §§ 549 and 550. The Plaintiffs also asserted a claim for

avoidance and recovery against Conklin for the pre-petition transfer of the Domain Name as well as a state law conversion claim against all of the defendants.

Appellants filed their answer to the Amended Complaint on July 26, 2007. Sayers and PSNet filed their answer on July 27, 2007. Defendants Conklin, Timothy, and Promarketing did not filed answers. Default certificates were subsequently entered against Timothy, Promarketing, and Conklin on various dates, but no default judgment was sought, nor entered previously.

The trial commenced in this Adversary Proceeding on November 4, 2008, and lasted for 19 days over a period of eight months. After the trial's conclusion, the Bankruptcy Court entered judgment in favor of the Plaintiffs/Appellees granting, among other things, declaratory judgment stating that the liquidating trust owned the Domain Name at all time since the Petition Date; judgment declaring all post-petition transfers to be in violation of the automatic stay and void; judgment under state law conversion claims; and judgment on the turnover counts. Appellants appealed these judgments to this court, and are seeking reversal on multiple issues.

## **STANDARD OF REVIEW**

A district court, sitting in appellate review pursuant to 28 U.S.C. § 158 of a bankruptcy court's final judgment, reviews the bankruptcy court's factual findings for clear error.[4] "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."[5] Under this standard, "an appellate court defers to the trial court's assessment of the credibility of witnesses and other disputed facts: 'It is the responsibility of an appellate court to

---

[4] *Flying J. Inc. v. Comdata Network, Inc.,* 405 F.3d 821, 829 (10th Cir. 2005).
[5] *United States v. United States Gypsum Co.,* 333 U.S. 364, 394-95 (1948).

accept the ultimate factual determinations of the fact-finder unless that determination either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data.'"[6]

Unlike factual findings, legal conclusions are reviewed de novo and no deference is given to them.[7]

## **DISCUSSION**

Appellants highlight nine separate points in their appeal. In an effort to provide structure to this opinion, this court will not address each point individually. Instead, this court has chosen to address only the necessary issues for its decision and has done so in an order that it deems appropriate. As a preliminary note, this court agrees with Appellees' assertion that they prevailed on multiple theories and under multiple claims at trial.[8] This is shown by the Bankruptcy Court's use of alternative theories in reaching its conclusion.[9] This court also agrees that Appellees need not prevail on all matters of law contested by Appellants in order for the Bankruptcy Court's Judgment to be affirmed.

## **Standing**

Appellants assert that the Trustee and ConsumerInfo both lacked "standing to prosecute each of the estate's claims that were asserted in the AP" and, for that reason, the Adversary Proceeding should have been dismissed prior to trial and without any consideration of the

---

[6] *In re Ford*, 492 F.3d 1148, 1154 (10th Cir. 2007) (quoting *Gillman v. Scientific Research Prods. Inc. of Delaware(In re Mama D'Angelo)*, 55 F.3d 552, 555 (10th Cir. 1995) and *Exxon Corp v. Gann,* 21 F.3d 1002, 1005 (10th Cir. 1994)).
[7] *Ershick v. United Missouri Bank of Kansas City, N.A.,* 948 F.2d 660, 666 (10th Cir. 1991).
[8] *Brief of Appellee* at 19.
[9] *Memorandum Decision* at 55.

merits.[10]  More specifically, Appellees maintain that because the Adversary Proceeding was transferred to the Liquidating Trust under the Joint Plan, and neither of the Plaintiffs is a debtor or bankruptcy trustee, Plaintiffs had the burden to demonstrate standing under § 1123(b)(3)(B). Addressing this argument, the Bankruptcy Court found that the Trustee had standing under this section, and that Consumerinfo's standing is independent from this section and derived from the ConsumerInfo  APA, Sale Order, and the Joint Plan.[11]  For reasons stated herein, this court agrees with the Bankruptcy Court.

**Trustee's Standing**

Under § 1123(b)(3)(B), claims belonging to the debtor or the estate may be retained under a plan but must be prosecuted by a "representative of the estate" appointed for such purposes.[12] When evaluating this section, the Tenth Circuit applies what is commonly referred to as the *Sweetwater* test.[13]  Under the *Sweetwater* test, a party is not deemed a "representative of the estate," and therefore, lacks standing, unless it proves: (1) that it was appointed under the plan, and (2) that "a successful recovery by the appointed representative would benefit the debtor's estate and particularly, the debtor's unsecured creditors."[14]  Appellants do not contest the first prong of the *Sweetwater* test with respect to the Trustee's standing.  Thus, this court's analysis will focus on the second prong requiring a "benefit to the debtor's estate."

The crucial legal issue raised by Appellants with respect to the benefit prong is whether the estate, and specifically, the unsecured creditors, must receive "a prospective benefit from the

---

[10]*Brief of Appellee* at 20.
[11]*Memorandum Decision* at 35.
[12] 11 U.S.C. § 112.(b)(3)(B).
[13]  *In re Sweetwater,* 884 F.2d 1323 (10th Cir. 1989).
[14] *Id.* At 1327.

-25-

recovery or whether the pre-confirmation receipt of payment from a purchaser of the estate's

recovery will do."[15]  Appellants assert that the benefit must be prospective, and that the estate

received no prospective benefit from the Trustee's prosecution of the Adversary Proceeding.[16]  In

support of this proposition, Appellants cite to the Tenth Circuit case of *Retail Marketing Co. v.*

*Rhuems* ("*Mako*").[17]  This court disagrees with Appellants' characterization of *Mako*.  Further,

this court agrees with the Bankruptcy Court's assertion that:

> *Mako* is distinguishable on at least two grounds.  First, unlike here,
> the party prosecuting the avoidance actions in *Mako* was neither the
> trustee nor the party designated in the plan to pursue those actions.
> In fact, the *Mako* court pointed out that the appellant lacked standing,
> in part, because the plan designated a litigation trustee to pursue
> those actions whereas here, Jubber, as the Liquidating Trustee, was
> specifically appointed under the Joint Plan to pursue the Adversary
> Proceeding.   Second, unlike the appellant in *Mako* who pursued the
> avoidance action in order to recoup the money it was required to pay
> under the plan to satisfy the administrative claims, the Trustee did not
> pursue this Adversary Proceeding to recoup funds that ConsumerInfo
> paid into the Joint Plan, but to fulfill his duties under the
> ConsumerInfo APA and the Sale Order.  Under the terms of this
> Court's final non-appealable Sale Order and the related
> ConsumerInfo APA, the Trustee has an obligation to prosecute this
> Adversary Proceeding.[18]

However, even if Appellants' assertion that *Mako* requires the benefit to the estate to be

prospective, this court finds that the Trustee, at the time the Adversary Proceeding commenced,

sought a benefit to the estate.

In addition to the return of the Domain Name, the Trustee sought substantial money

damages in connection with several of the counts, as well as an award of his costs.[19]  The First

---

[15] *Brief of Appellant* at 21.
[16] *Id.*
[17] 884 f.2d 1323 (10th Cir. 1989).
[18] *Memorandum Decision* at 37-38.
[19] Applee. Supp. App. at 4-161.

Amended Complaint clearly sought both "an order and judgment pursuant to 11 U.S.C. § 550(a) returning the Domain Name to the Trustee," as well as a ruling that "the Trustee is entitled to all profits or licensing royalties or fees derived from the Domain Name."[20] Further, the Joint Trial Brief filed by Appellees made clear that substantial money damages were being sought in addition to recovery of the Domain Name, as did the Bankruptcy Court's Pretrial Order.[21] This court finds the fact that the Bankruptcy Court did not actually award damages irrelevant. Bankruptcy law cannot be that post-confirmation standing is conditioned upon the success of the claims being litigated. What this court finds determinative is that damages were sought in addition to the Domain Name, and that at the time they were sought, the CCB Related Claims had been subordinated and remained unpaid, along with other obligations, so there was a potential benefit to the estate and its remaining unsecured creditor and to SMDI who was the purchaser of the residual equity in the estate.[22] Thus under *Sweetwater* and Appellants' interpretation of *Mako,* the Trustee had standing.

**ConsumerInfo's Standing**

---

[20] Aplt. App. At 349-366.

[21] Applee. Supp. App. at 4-161 (Plaintiffs' Joint Trial Brief), at 98-108; Aplt. App. at 375-473 (Pre-Trial Order), at 22-23.

[22] *See, e.g., Gonzales v. Nabisco Div. of Kraft Foods, Inc. (In re Furrs)*, 294 B.R. 763 (Bankr. D.N.M. 2003), *aff'd,* 317 B.R. 423; *Gonzales v. Nabisco Div. of Kraft Foods, Inc. (In re Furrs)*, 294 B.R. 763, 772 (Bankr. D.N.M. 2003), *aff'd,* 317 B.R. 423 (the term "benefit to the estate" is "not a defined term or phrase in the Code," and "the estate benefits when the action increases the value or assets of the estate"); *Mellon Bank, N.A. v. Dick Corp.*,351 F.3d 290 (7th Cir. 2003) *Mellon Bank, N.A. v. Dick Corp.*, 351 F.3d 290, 293 (7th Cir. 2003) ("Having put the *prospect* of preference recoveries to work for the benefit of all creditors (including the unsecured creditors) *ex ante* by effectively selling them to the secured creditors in exchange for forbearance—and in the process facilitating a swift sale that was beneficial all around—the bankruptcy judge did not need to use them *ex post* a second time, for still another benefit to the estate; there was no further benefit to be had.") (emphasis in original); 5 Collier on Bankruptcy (15th Ed. Rev. 2002), at 550-7 ("If the recovery will have some positive benefit to the estate or its creditors, however, recovery may be had even if such benefit is indirect.").

-27-

Unlike the Trustee, ConsumerInfo need not rely on § 1123(b)(3)(B), which applies only to parties who have no independent basis for standing.[23] This court agrees with the Bankruptcy Court's finding that "ConsumerInfo derives its authority to prosecute the Adversary Proceeding from the ConsumerInfo APA, the Sale Order, and the Joint Plan, in which it was granted a separate and undivided co-interest in all of the claims asserted in this proceeding."[24]

Specifically, paragraph 1.1(c) of the ConsumerInfo APA grants ConsumerInfo a co-interest in the Adversary Proceeding. As a result, ConsumerInfo has an ownership interest in every claim pending in this proceeding. Under the Sale Order, which approved the ConsumerInfo APA, the Bankruptcy Court authorized a sale of an undivided co-interest in all of the causes of action in the Adversary Proceeding, along with a 25% interest in any net damage recoveries, to ConsumerInfo. Importantly, although the Sale Order addressed certain rights that the Trustee would retain notwithstanding the fact that ConsumerInfo had acquired these interests, the Sale Order did not preclude ConsumerInfo from participating in the Adversary Proceeding as a co-plaintiff. Although ConsumerInfo was not a party to the Adversary Proceeding as of the date of the Sale Order, the Sale Order and the ConsumerInfo APA clearly contemplated for this to occur. The Sale Order and the ConsumerInfo APA authorized the Trustee to enter into a joint prosecution agreement with ConsumerInfo allowing the estate and ConsumerInfo to advance their separate but connected interests. The Sale Order was not appealed by Appellants and is now final and binding.

Based on the foregoing, this court concludes that ConsumerInfo, as a co-plaintiff and a co-owner of the claims, need not rely on § 1123(b)(3)(B) to establish its standing in the Adversary

---

[23] 11 U.S.C. § 1123(b).
[24] *Memorandum Decision* at 35.

Proceeding, and this court agrees with the Bankruptcy Court's conclusion that ConsumerInfo had proper standing in this proceeding.[25]

### Bankruptcy Court's Evidentiary Standard

Appellants maintain that the Bankruptcy Court erred when it applied the preponderance of the evidence standard derived from the United States Supreme Court case of *Grogan v. Garner*.[26] Appellants claim the Bankruptcy Court should have applied the clear and convincing evidence standard as articulated in the Tenth Circuit case of *In re Amdura*.[27] For the reasons stated herein, this court agrees with the Bankruptcy Court's use of the preponderance of the evidence standard.

In *Grogan*, the United States Supreme Court held that the general preponderance of the evidence standard in civil actions also applies in bankruptcy matters, unless "particularly important individual rights or interests are at stake."[28] The issue in *Grogan* was whether the debtor should be denied a discharge based on "actual fraud" – the kind of conduct which in many states requires clear and convincing evidence to establish. The Supreme Court nevertheless held that the preponderance standard applied, and rejected the argument that the "fresh start" policy of the Bankruptcy Code required a higher standard of proof for non-dischargeability claims.[29] Despite this clear holding from the Supreme Court, which is still valid and binding upon all federal courts, Appellants believe that a clear and convincing standard should be used based on the language in *Amdura*.

---

[25] *See Memorandum Decision* at 35.
[26] 498 U.S. 279 (1991).
[27] 75 F.3d 1447 (10th Cir. 1996).
[28] 498 U.S. 279, 286, 291.
[29] *Id.*

-29-

In *Amdura*, a debtor-subsidiary sought turnover of funds in a debtor-parent corporation's bank account (known as a concentration account) and an injunction against the parent's use of the funds to pay its creditors.[30]  Under the parent's cash management system, all of its subsidiaries' individual receipts from each of their individual lockbox accounts were swept daily into the parent's concentration account.[31]  This arrangement gave the parent complete control over the concentration account funds, which it used to pay its subsidiaries' as well as its own obligations.[32] The bankruptcy court declined to issue an injunction, and both parties filed cross-motions for summary judgment.  After the bankruptcy court granted the parent's motion, the debtor-subsidiary appealed. The district court affirmed, and the subsidiary appealed again.  The Tenth Circuit Court of Appeals noted that the subsidiary was required to "prove with clear and convincing evidence" that the funds in the concentration account were property of the subsidiary's bankruptcy estate.[33] It then concluded that because the concentration account was exclusively in the parent's name and the parent "possessed all other legally cognizable indicia of ownership," the subsidiary did not have an ownership interest in any of the funds in the concentration account.[34]

In applying the clear and convincing evidence standard, the court in *Amdura* failed to articulate what facts, if any, warranted departure from the preponderance standard set forth by *Grogan.*  However, an examination of *Amdura's* application of the clear and convincing standard might shed light on why it was used.  *Amdura's* application of the clear and convincing standard

---

[30]*Amdura Corp.*, 75 F.3d at 1450.
[31]*Id.* at 1449.
[32] *Id.*
[33] *Id.* at 1451.
[34] *Amdura Corp.*, 75 F.3d at 1451. (Amdura analysis adopted from the Memorandum Decision.)

stems from a pre-Bankruptcy Code Supreme Court case, *Maggio v. Zeitz*[35], and reliance on this pre-Code case in this situation is misplaced. The pre-Code basis for applying a higher standard in turnover cases was premised on the fact that there was nothing in the Bankruptcy Act providing for turnover and the courts had resorted to their equitable power to order turnover of estate property. That problem was remedied in the Bankruptcy Code § 542, which proides express statutory authority for turnover. The Code provides no heightened standard of proof for turnover. In *Grogan*, the Supreme Court noted that congressional silence on the standard is "inconsistent with the view that Congress intended to require a special, heightened standard of proof."[36] Indeed, most courts that have substantively analyzed the standard of proof which should apply in a turnover action are in agreement that a preponderance standard is appropriate.[37]

For these reasons, this court affirms the Bankruptcy Court's use of the preponderance standard.

## Ownership of the Domain Name

Title 11 U.S.C. § 541 details the scope of what constitutes "property of the estate," providing that property of the estate includes "(a) all legal or equitable interests of the debtor in property as of the commencement of the [bankruptcy] case" wherever located and by whomever held.[38] "[T]he scope of [§] 541 is broad and should be generously construed [;] . . . an interest may be property of the estate even if it is novel or contingent."[39] The Tenth Circuit Court of Appeals

---

[35] 333 U.S. 56 (1948)
[36] *Grogan,* 489 U.S. at 286.
[37] See, e.g., *In re Lee*, 415 B.R. 518, 523 (Bankr. D. Kan. 2009); *United States v. Krause (In re Krause)*, No. 05-17429, 2009 WL 243398 Bankr., at *10 (D. Kan., Jan. 30, 2009); *Matter of Alofs Mfg. Co.*, 209 B.R. 83, 89-91 (Bankr.W.D. Mich. 1997); *Hunter v. Patton (In re Patton)*, 200 B.R. 172, 174-75 (Bankr. N.D. Ohio 1996).
[38] *Parks v. FIA Card Servs., N.A. (In re Marshall)*, 550 F.3d 1251, 1255 (10th Cir. 2008)..
[39] *Id.*

interprets this section to mean that property that is titled in the name of the debtor and that is under the debtor's "dominion or control" is presumptively property of the estate.[40] The debtor has dominion or control if he has "the ability to direct the disposition of [the transferred property]."[41] Using the appropriate legal framework, the Bankruptcy Court concluded that, based on the evidence at trial, the Domain Name was property of Paige's estate at the time of the petition and at all relevant times post-petition, and that Appellants failed to rebut the presumption of Paige's ownership. This court agrees with the Bankruptcy Court's conclusion.

Specifically, the Bankruptcy Court found:

> It is undisputed that the Domain Name was registered in Paige's personal name from May 3, 2000 until June 14, 2005. During this time period, Paige was personally invoiced for the initial registration fee and the renewal fee, which he paid with his personal credit card. Although the SMDI Defendants argued that CCS reimbursed him for these charges, Becky Brady, the bookkeeper for CCS, testified that CCS paid Paige's entire personal credit card bill and not just the registration fee charges. Paige was also personally invoiced for web hosting services for the Domain Name.
>
> Even after Paige entered into the joint venture agreement with Colt in January 2005, the registration remained in Paige's personal name. The Domain Name was not transferred to Conklin until June 14, 2005. Although it remained in Conklin's name until November 24, 2005, Conklin testified that he never had an ownership interest in the Domain Name. He acknowledged that after the Colt Separation Agreement, he held the Domain Name at Paige's behest and would have transferred it to whomever Paige directed. The Court finds Conklin credible and his testimony persuasive.
>
> The Colt Separation Agreement effectively unwound the joint venture between Paige and Colt and cancelled the Colt APA. Although that agreement states that the Domain Name was to be transferred "back to CCS," all the principal parties to the agreement

---

[40] *See Amdura Corp.*, 75 F.3d at 1451; *see also Marshall*, 550 F.3d at 1255.
[41] *Marshall*, 550 F.3d at 1256-57.

testified that they understood that the Domain Name belonged to Paige and was to be returned to him personally. Specifically, Haleua, who drafted the Colt Separation Agreement and was the lead negotiator of the Colt APA, testified that pursuant to the Colt Separation Agreement the Domain Name was to go back to Paige because Haleua received it from Paige and his investigation of the Domain Name revealed that it belonged to Paige. The Court finds Haleua credible and his testimony on this issue reliable. Similarly, when asked about the effect of the Colt Separation Agreement at the September 2006 meeting with May and his attorney, Paige explained that the Domain Name was to be returned to him because he had purchased the Domain Name for himself and not CCS. The Court finds this explanation credible.[42]

After carefully reviewing these findings in light of the record, this court finds no clear error in the Bankruptcy Court's weighing of the evidence and assessment of the credibility of the witnesses. Moreover, this court agrees with the Bankruptcy Court's assessment that the phrase "back to CCS" in the Colt Separation Agreement is ambiguous.[43] It is unclear from the language in rgw Colt Separation Agreement whether the phrase "back to CCS" meant back to Paige, back to CCS, LLC, back to CCS Financial, back to Colt Credit Services, LLC, or back to someone else. Thus, the Bankruptcy Court was correct in its consideration of extrinsic evidence.

For these reasons, and based on the record as a whole, there is sufficient evidence to support the Bankruptcy Court's conclusion that "control and dominion of the Domain Name were exercised by Paige as of the Petition Date and for sometime thereafter."[44] Therefore, this court affirms the finding that the Domain Name was property of the estate at the time the automatic stay went into effect.

### Post-Petition Transfers of the Domain Name

---

[42] *Memorandum Decision* at 43-44.
[43] *Sparrow v. Tayco Constr. Co.,* 846 P.2d 1323 (Utah Ct. App. 1993).
[44] *Memorandum Decision* at 47.

The Bankruptcy Court found that the post-petition transfer of the Domain Name was involuntary and in violation of the automatic stay, which renders the post-petition transfer void *ab initio*. All parties agree that whether Paige was a willing participant in the initial post-petition transfer of the Domain Name to Sayers is critically important to the judgment issued in this case. Therefore, this court will direct its analysis to the question whether Paige's post-petition transfer was voluntary or involuntary.

Appellants assert that the Bankruptcy Court erred when it determined that Paige did not voluntarily transfer the Domain Name post-petition. Appellants maintain that the Bankruptcy Court's evaluation of the evidence was clearly erroneous. Additionally, Appellants believe that Appellees admitted that Paige's post-petition transfer was voluntary in Appellees'/Plaintiffs' amended complaint. Appellants assert that this constitutes a judicial admission that should not have been ignored by the Bankruptcy Court. This court finds that both these argument find some support. However, this court agrees with the Bankruptcy Court's assessment and outcome.

The Bankruptcy Court found that Paige did not initiate or authorize the post-petition transfer of the Domain Name. The Court stated that:

> In looking closely at the PSNet APA, which served as the basis for the Domain Name's transfer to PSNet/Sayers, the Court notes that the agreement is between PSNet as "Buyer" and CCS Financial and CCS, LLC as "Sellers." Paige is not listed as a "Seller." Pursuant to the agreement, PSNet purchased all of the assets and property of the "Seller," including "all intellectual property . . . and any additional credit related assets and/or software . . . owned by the Seller, *Steve Paige* . . . including the internet domain name 'freecreditscore.com.'" Although the agreement lists the Domain Name as one of the assets being sold to PSNet, Paige did not *personally* sign the PSNet APA. Rather, he signed it in his capacity as "Managing Member" of "CCS Financial, LLC/Consumer Credit Services, LLC."

Accordingly, since the Debtor was not *individually* a party to the agreement, and where the Court has found that Paige was the owner on the Petition Date, any attempted transfer of the Domain Name to PSNet pursuant to the PSNet APA was without the Debtor's authorization. This may have been sloppy paperwork by the parties, but considering how Paige referred to and treated his ownership in the Domain Name, it is not surprising. Nevertheless, this persuades the Court that there was no voluntary transfer from Paige because he never signed the agreement personally. The Court will not delve into revising this agreement. All this agreement does is refer to an asset owned by Paige. Without him conveying it, the agreement did not and could not transfer any title in the Domain Name.

The Court further finds that the PSNet APA is ambiguous on its face. As such, it is appropriate to consider extrinsic evidence to determine its true meaning and effect. Paige's trial testimony and statements at the September 2006 meeting show that the Debtor did not initiate the Domain Name's transfer to PSNet. Specifically, when he was asked abut the PSNet-CCS transaction, Paige testified that the Domain Name was not supposed to be part of that transaction. He explained that the PSNet-CCS transaction, memorialized in the PSNet APA, only involved the purchase of CCS assets, not his personal assets. Paige further testified that at no point did he authorize Sayers to put the Domain Name in Sayers' name. He clarified that when he asked Sayers to facilitate the Domain Name's transfer from Conklin back to him (Paige), he did NOT agree to Sayers' putting it in his own name. These statements appear to be consistent with Paige's responses at the September 2006 meeting held in the SMDI Defendants' counsel's office where Paige stated that when PSNet/Sayers had expressed an interest in purchasing CCS, Paige made it clear that the Domain Name would not be part of the transaction. Notwithstanding the Court's aversion to giving credibility to Paige's other statements, the Court finds Paige's testimony and statements on this issue credible and persuasive.[45]

This court finds nothing in the record or in the Bankruptcy Court's findings that lead it to believe that the finding of involuntary transfer was clearly erroneous. Moreover, this court agrees with the Bankruptcy Court's legal assessment that the PSNet APA is ambiguous.

---

[45] *Memorandum Decision* at 52-53.

This court also finds that the allegations in the Amended Complaint do not run counter to the Bankruptcy Court's factual findings, and that the Pretrial Order established the issues to be considered at trial and superseded the pleadings.[46] Furthermore, nothing in the Pretrial Order was inconsistent with the Bankruptcy Court's factual findings here, and this court reads the Pretrial Order's questions of "[w]ere purported transfers of the Domain Name after the Petition Date void as violations of the automatic stay of Section 362 of the Bankruptcy Code?" and "[d]id any transfers of the Domain Name after the Petition Date violate the automatic stay, thus making such transfers void?" as demonstrating that the issue was not resolved by procedural admissions and was ripe for decision.

For these reasons, this court finds that Paige did not voluntarily transfer the Domain Name after the Petition Date and affirms the Bankruptcy Court's finding that all post-petition transfers are void *ab initio* by the automatic stay.[47] Because of this finding, this court need not discuss whether relief must have been sought and granted pursuant to 11 U.S.C. §§ 549, 550.


## Paige's Rights in the Domain Name

Appellants maintain that Paige's rights in the Domain Name were intangible contract rights to use the Domain Name under the terms of the service agreement with Network Solutions, and not ownership rights.[48] Appellants assert that if Paige's rights are construed to be contract rights,

---

[46] *Lane v. Geiger-Berger Assocs., P.C*, 608 F.2d 1148, 1152-53 (8th Cir. 1979).
[47] This court agrees with the Bankruptcy Court's legal assessment that Section 362 and 549 are mutually exclusive and adopts its reasoning for that conclusion here.
[48] *Brief of Appellant* at 9.

Appellees' do not have a cognizable claim to possession of the Domain Name under § 542 (turnover) or conversion. For the reasons stated herein, this court disagrees.

Utah law does not specifically define the nature of a domain name holder's rights. At trial, both parties argued for the adoption of precedent from other jurisdictions. The Bankruptcy Court was not persuaded by these arguments, and instead relied on a recent decision from this court entitled *Margae, Inc. v. Clear Link Technologies, LLC*.[49]

In *Margae*, an entrepreneur filed an action against a competitor alleging conversion of its web pages and other intellectual property. The issue before the court was whether Utah law recognized a claim for conversion of intangible intellectual property. While noting that this was a case of first impression, the court explained that Utah would not allow a conversion claim for intangible property because Utah follows the Restatement (Second) of Torts.[50] The court reasoned that the "[r]estatement generally limits conversion actions involving intangible property to intangible property that is 'customarily merged in a document.'"[51] The court rejected the argument that web pages are intangible property subject to the merger requirement. Instead, the court held that "Utah would consider web pages as a type of tangible property."[52]

The court then cited a case from the Utah Supreme Court which held that "software is 'tangible personal property' for tax purposes, even after it has been installed on the computer."[53] In its holding, the Utah Supreme Court explained that "[s]oftware is information recorded in a

---

[49] 620 F. Supp. 2d 1284 (D. Utah 2009).
[50] *Id.* at 1287.
[51] *Id.* (citing RESTATEMENT (SECOND) OF TORTS § 242(2)).
[52] *Id.*
[53] *Id.* (citing *South Cent. Utah Tel. Assoc., Inc. v. Auditing Div. of the Utah State Tax Comm'n*, 951 P.2d 218, 223-24 (Utah 1997)).

physical form which has a physical existence, takes up space on the tape, disc, or hard drive, makes physical things happen, and can be perceived by the senses. The purchaser of computer software neither desires nor receives mere knowledge but an arrangement of matter that will direct a computer to perform a particular function."[54] Relying on the Utah Supreme Court's characterization of software, the *Margae* court concluded that "like 'software' . . . a web page has a physical presence on [sic] computer drive, causes tangible effects on computers, and can be perceived by the senses."[55] The court further noted that web pages are tangible personal property because "they can be physically altered by authorized users and access to web pages can be physically restricted by the use of passwords and other security measures."[56] This court agrees with the Bankruptcy Court's use of *Margae.*

Like the software and web pages discussed in *Margae*, a domain name "has a physical presence on a computer drive [here, the definitive database, or registry, that associates domain names with the IP numbers], causes tangible effects on computers [here, by directing Internet queries to the related web resources], and can be perceived by the senses."[57] Additionally, as the Bankruptcy Court correctly pointed out, like web pages and other forms of property, "access to [domain names] can be physically restricted by the use of passwords and other security measures."[58] Thus, the Bankruptcy Court's finding that Paige's rights in the Domain Name were that of a holder with tangible property rights is consistent with the reasoning adopted by Utah courts in similar situations.

---

[54]*Id.* at 1288 (quoting *South Cent. Utah Tel. Assoc., Inc.*, 951 P.2d at 223-24).
[55]*Margae*, 620 F. Supp. 2d at 1288.
[56]*Id.*
[57]*Margae*, 620 F.Supp.2d at 1288; (Aplt. App. 59)
[58] (Aplt. App. 59); Margae, 620 F.Supp.2d at 1288.

This court disagrees with Appellants' suggestion that, as demonstrated by the Service Agreement, Network Solutions owned the Domain Name.[59]  The service agreement was not a license from Network Solutions as an owner authorizing use of a domain name under which the non-owner user pays royalties to Network Solutions.  Rather, it is exactly what its title says, an agreement under which Network Solution provided technical services at a nominal fee from a registrar to support the domain name owner.

It should be noted that the domain name registration system is a private registration system that is not regulated by any governmental entity.[60]  There are a number of private domain name registries, and a party who registers a domain name through a registration service (such as Network Solutions) controls changes in the registration information, and therefore is free to use a different registrar company's services at any time.[61]  In fact, as Appellants' own domain name expert testified, anyone can either register a domain name or change registration to a domain name if he or she has the proper passwords and codes.[62]  Domain name registrars are "private companies that have the right to have contracts with each one of the registrees in order to provide services of the registering domain names to the general public."[63]  In other words, the owner of the domain name can change the registrar of the domain name if he or she chooses.  Providing services related to supporting a domain name does not make the service provider the owner of the domain name.

[59] *Reply of Appellant's* at 12.
[60] Applee. Supp. App. 803-806 (11/5/08 Trial Transcript, Testimony of Donahey, p. 32, ln. 14 to p. 34, ln. 24.
[61] *Id.*
[62] Applee. Supp. App. 825 (11/12/08 Trial Transcript, Testimony of Steven Lieberman, p. 204, ln. 5-8).
[63] Applee. Supp. App. 824 (11/12/08 Trial Transcript, Testimony of Lieberman, p. 155, ln. 12-15 (emphasis added).

Thus, Network Solutions did not own the Domain Name at the time of the petition or thereafter. Accordingly, this court affirms the Bankruptcy Court on these points.

### Turnover Claim

Appellants argue that the Bankruptcy Court's judgment requiring Appellants to turnover the Domain Name should be reversed because the Domain Name was of inconsequential value to the estate.[64] Appellants state that "by pledging the Domain Name to CIC [ConsumerInfo], Jubber [the Trustee] eliminated the possibility of any prospective value or benefit to the estate flowing from the successful prosecution of the claim."[65] This court strongly disagrees.

This court finds telling Appellants' subsequent statement that it "has not located any reported case that applies the analysis stated above to turnover actions."[66] This court has also failed in the same endeavor. However, what this court has found are three express facts that clearly demonstrate that the Domain Name was of value to the estate, including: (1) if the estate failed to prosecute the Adversary Proceeding in good faith, it would forfeit the substantial consideration that came into the estate under both the Sale Order and the Joint Plan;[67] (2) ConsumerInfo's obligation to continue to fund the liquidating trust was tied to the Trustee's fulfilling his contractual obligation to pursue the Adversary Proceeding in good faith and the liquidating trust would have been in breach of those contracts if it failed to do so subject to potential damages; and (3) as mentioned above, the Adversary Proceeding not only sought recovery of the Domain Name but also sought substantial economic damages and costs. It is

---

[64] *Reply of Appellants* at 18.
[65] *Reply of Appellants* at 19.
[66] *Reply of Appellants* at 20.
[67] Applee. Supp. App. 33-34(Adv. Pro Dkt. 271(Plaintiffs' Joint Trial Brief, pgs. 30-32).

evident from the foregoing that the estate clearly benefitted from the prosecution of the Adversary Proceeding. Consequently, the Bankruptcy Court is affirmed with respect to this issue.

## **State Conversion Claim**

Because this court has articulated independent grounds for affirming the Bankruptcy Court's judgment, it need not address the parties' conversion claims.

## **Alleged Erroneous Rulings**

In an apparent last ditch effort to obtain a reversal, Appellants assert that the Bankruptcy Court committed a plethora of errors regarding the evidence used at trial. Many of Appellants' assertions have already been answered in this court's evaluation of Appellant's other claims. However, to the extent that this court has not addressed an issue, the court did a de novo review of the legal issues and finds nothing warranting a reversal of the Bankruptcy Court's findings. Additionally, nothing in Point VIII of Appellants' Brief or Point IX of Appellants' reply demonstrates that the Bankruptcy Court clearly erred with respect to its factual findings. Thus, a reversal and remand on the grounds asserted by Appellants is unwarranted.

## **CONCLUSION**

This court affirms the Bankruptcy Court's finding that both the Trustee and ConsumerInfo had standing in the Adversary Proceeding. Moreover, this court affirms the finding that the use of perponderence standard by the Bankruptcy Court was correct. This court also affirms the finding that Paige exercised control and dominion over the Domain Name at all relevant times pre and post-petition and that the Domain Name was property of the estate pursuant to 11 U.S.C. § 541. Because the Domain Name was property of the estate at the time the petition was filed, the

automatic stay rendered any involuntary post-petition transfer void *ab initio*. This court affirms the finding that Paige did not voluntarily transfer the Domain Name post-petition. This court affirms the finding that Paige had a tangible interest in the Domain Name and not a mere contractual interest and that the Domain Name was of consequential value to the estate.

For the forgoing reasons, this court Affirms the Judgment of the Bankruptcy Court.

# 2.     CROSS-APPEAL

## **INTRODUCTION**

In addition to the Appeal, this court has a cross-appeal ripe for decision. To avoid unnecessary repetition, this opinion incorporates the facts and references set forth in the Appeal opinion. Namely, this court will continue to refer to the Trustee and ConsumerInfo as "Appellees" and SMDI and May as "Appellants."

## **DISCUSSION**

Appellees assert that the Bankruptcy Court erred by failing to award them monetary damages based upon their amended complaint's 1) Fifth Claim for relief concerning violations of the automatic stay; 2) Seventh Claim for Relief seeking relief for conversion; and 3) Ninth Claim for Relief seeking a declaratory judgment. [68] For reasons discussed herein, this court AFFIRMS the Bankruptcy Court's findings.

## 1.        Violation of the Stay

---

[68] *Cross-appeal brief of Appellee* at 67.

The Bankruptcy Court found that there was "insufficient evidence to support an award of actual or punitive damages under" 11 U.S.C. § 362.[69] This court agrees with that finding. The Bankruptcy Court conducted a 19-day trail and weighed the evidence carefully before coming to its conclusion. After carefully evaluating the record and the evidence cited by Appellees, this court finds no clear error in the Bankruptcy Court's judgment or conclusion, and therefore affirms the Bankruptcy Court's finding.

**2.    Conversion**

The Bankruptcy Court held that there was an insufficient basis for awarding punitive damages on the conversion claim.[70] This court agrees with the Bankruptcy Court's holding. This court also finds that Appellees failed to prove a particular loss resulting from the absence of the Domain Name and are not entitled to damages.

In awarding damages for conversion, courts generally award the value of the property at the time of conversion plus interest.[71] When the converted property has been returned, courts have found it appropriate in some circumstances to award "damages based on the value of the plaintiff's loss of use of the converted property."[72] However, "if the property's rightful owner cannot prove any particular pecuniary loss resulting from the absence of the property, damages for the loss of its use are not awardable."[73]

---

[69] *Memorandum Decision* at 63.

[70] *Memorandum Decision* at 63.

[71] *Mahana v. Onyx Acceptance Corp.*, 96 P.3d 893, 899 (Utah 2004) ("Generally, the measure for damages in a conversion action is the value of the converted property at the time of conversion plus interest").

[72] *Id.* at 893.

[73] *Henderson v. For-Shor Co.,* 757 P.2d 465, 470 (Utah Ct. App. 1988).

Appellees did not prove a particular loss suffered by the bankruptcy estate resulting from the loss of use of the Domain Name. Appellees' own expert, John Curtis, testified that the Plaintiffs did not request that he compute the amount of money that they could have made from the Domain Name.[74] Moreover, pursuant to the APA, the Trustee was required to immediately transfer the Domain Name to ConsumerInfo.com as soon as it was recovered. Thus, Appellees failed to show how or when the bankruptcy estate would use the Domain Name or profit from it.

For these reasons, this court affirms the Bankruptcy Court's denial of monetary damages for the conversion claim.

## 3.    Declaratory Judgment

Appellees argue that the Bankruptcy Court erred by not awarding damages in addition to the declaratory judgment. Appellees' argument is puzzling to this court. In their trial brief, Appellees argued that the bankruptcy estate was entitled to a declaration that the Domain Name was property of the estate as of the petition date. They stated that "[t]he declaratory judgment claim *merely* seeks a declaratory judgment that the Domain Name was or is property of the estate . . . ."[75] This relief is exactly what the Bankruptcy Court awarded Appellees. Appellees exhaustively argued for damages on the other claims, and it now appears that Appellees want to use these arguments to convince this court that Appellees sought damages under the Declaratory Judgment claim in addition to recovery of the Domain Name. Unfortunately for Appellees, this

---

[74] Aplt. Supp. App. 147 (11/5/08 Tr. at 119/2-6 (Curtis))
[75] Applee. Supp. App. 117 (Pls. Trial Brief p. 89) (emphasis added)

argument is not supported by anything in the record, and it is this court's opinion that Appellees received the relief requested pursuant to their trial briefs.

**CONCLUSION**

Based on the foregoing reasons, this court affirms the Bankruptcy Court's decision on damages.

# 3.    JOINT SUGGESTION OF MOOTNESS

In addition to the facts set forth above, this court finds it necessary to include the following supplemental facts**:**

The Bankruptcy Court ordered Appellee Trustee to convey the Domain Name to Appellee ConsumerInfo pursuant to the Sale Order and the ConsumerInfo APA. The Sale Order, entered by the Bankruptcy Court in December 2006, was never appealed, and became final and non-appealable shortly after its entry. The Sale Order authorized the sale of all of the bankruptcy estate's rights in the Domain Name to Appellee ConsumerInfo, "effective as of the date of the Subsequent Closing" pursuant to the ConsumerInfo APA.[76] The Sale Order provides "[t]he Domain Name Assets are authorized to be sold, free and clear of claims, liens, interests and encumbrances pursuant to Sections 363(f) and 105 of the Bankruptcy Code, effective as of the date of the Subsequent Closing and pursuant to the Agreement. The defendants [Appellants] in the Pending Adversary shall retain their defenses pending a ruling of such defenses in the Pending Adversary." [77]

_____

[76] Sale Order, ¶6.
[77] _Id._

However, the Sale Order also states that Appellees' purchase of the Domain Name is "entitled to all of the protections of Section 363(m) of the Bankruptcy Code."[78]

The ConsumerInfo APA provided that the Subsequent Closing occurred, and title of the Domain Name vested, in Appellee ConsumerInfo "on the first business day which falls 10 business days following a final and nonappealable order in form and substance reasonably acceptable to Purchaser determining that (i) the Estate owns the Domain Name and can transfer them to Purchaser free and clear of all Interests, or (ii) the Estate can recover the Domain Name under one or more theories and the Estate in fact recovers such Domain Name and can transfer it to Purchaser free and clear of all Interests."[79]  The ConsumerInfo APA also provided that the Subsequent Closing and conveyance of the Domain Name would occur prior to any order or judgment from the Bankruptcy Court becoming final and non-appealable, "so long as there is no stay pending appeal in effect at the time."[80]

With these facts in mind, the court now turns to the issue of mootness.

## **DISCUSSION**

The Tenth Circuit Court of Appeals generally dismisses as moot appeals from sales of estate assets if (i) an appellant has not obtained a stay of a sale order pending appeal; (ii) the sale transaction has been substantially consummated; and (iii) the reviewing court cannot grant effective relief upon appeal.[81]  It is perfectly clear from the facts that a stay of the Sale Order was

---

[78] *Id.* ¶8.
[79] *ConsumerInfo APA* ¶8.1.
[80] *Id.*
[81] *See, e.g.,Southwestern Bell Tel. Co. V. Long Shot Drilling, Inc.,* 224 B.R. 473, 478 (10th Cir. BAP 1998) *In re Lotspeich,* 2008 WL 1989758, at *4 (10th Cir. BAP May 7, 2008) (citing *In re Telluride Income Growth LP,* 364 B.R. 407, 412-13 (10th Cir. BAP 2007); *Hower v. Molding Sys. Eng'g, Corp.,* 445 F.3d 935, 937-238 (7th Cir. 2006); *Metro. Life Ins. Co. v. Milk Palace Dairy, LLC (In re Milk Palace Dairy, LLC),* 327 B.R. 462, 466-67 (10th

not obtained.  Importantly, Appellants also failed to receive a stay of the Bankruptcy Court's

Judgment post-Adversary Proceeding.  The facts also show that both the Trustee and

ConsumerInfo substantially consummated the transaction by entering into the ConsumerInfo APA

and by ConsumerInfo's transferring of consideration to the estate in exchange for the Domain

Name.  Thus, the only remaining issue for this court's consideration is whether it can fashion

effective relief.

The only effective relief sought by Appellees is a return of the Domain Name, and this

court cannot fashion such relief because it is statutorily barred by 11 U.S.C. § 363(m).  Section

363(m) provides that a purchaser of property of the estate is entirely protected from a reversal of

the order approving the sale on appeal as long as the purchaser acted in good faith and the

appellant failed to obtain a stay of the final order authorizing the sale to close.[82]  Specifically,

section 363(m) provides, in pertinent part:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property does
> not affect the validity of a sale or lease under such authorization to an
> entity that purchased or leased such property in good faith, whether
> or not such entity knew of the pendency of the appeal, unless such
> authorization and such sale or lease were stayed pending appeal.

In analyzing section 363(m), the Tenth Circuit Court of Appeals found that the validity of

the sale of a debtor's property is, as a matter of law, unaffected by the reversal or modification of

the order permitting the sale under § 363(b) or (c), unless the sale permitted by the order is stayed

_____

Cir. BAP 2005).
   [82]*Tompkins v. Frey ( In re Bel Air Assocs., Ltd.*), 706 F.2d 301, 304-05 (10th Cir. 1983) (applying old
Bankruptcy Rule 805, which mirrored the language of § 363(m)).

pending appeal.[83]  A finding of good faith under section  363(m) therefore moots appeals in cases

"where the only remedies available are those that affect the validity of the sale."[84]  In discussing the

rationale behind section 363(m), the United States Bankruptcy Court for the District of Utah found:

> Section 363(m) is designed to foster two independent but related policies in bankruptcy law. First, the section affords finality to judgments by protecting good faith purchasers, the innocent third parties who rely on the finality of bankruptcy judgments in making their offers and bids. Thus, a stay is important under this theory because, [w]ithout the degree of finality provided by the stay requirement, purchasers are likely to demand a steep discount for investing in the property. The second reason why dismissal of an appeal pursuant to section 363(m) once a sale has been consummated is appropriate is because the court has no remedy that it can fashion even if it would have determined the issues differently. This theory is broader than the finality rule, and stresses a court's general jurisdictional bar from deciding cases in which it cannot provide a remedy. Finally, the aforementioned policies are interrelated because the rule of finality limits the remedies that an appellate court can provide, as the court cannot order relief without compromising the integrity of the sale of the property to a good faith purchaser.[85]

This court finds this policy statement informative because it makes clear that the purpose of section

363(m) is to make a good faith sale final and inviolable unless the sale was never closed and

consummated.  As mentioned above, the sale of the Domain Name was closed and consummated.

Thus, the only relevant inquiry remaining is that of ConsumerInfo's good faith.  This court,

however, need not look far for an answer to this inquiry.

The Sale Order contains an express section 363(m) finding regarding ConsumerInfo's good

faith, and ConsumerInfo's entitlement to the protections of that statute.  In entering the Sale Order, the

---

[83] *Kunz v. Cray Computer Corp. (In re Cray Computer Corp.)*, 1996 WL 547320, at *1 (10th Cir. Sept. 26, 1996).

[84] *In re Osborn,* 24 F.3d 1199, 1203-04 (10th Cir. 1994)

[85] *United Mine Workers of Am. Combined Fund v. CF & I Fabricators of Utah, Inc. (In re CF & I Fabricators of Utah, Inc.)*, 169 B.R. 984, 991 (Bankr. D. Utah 1994).

Bankruptcy Court made an express finding on this issue. Moreover, Appellees never appealed this issue or any part of the Sale Order and this court will not revisit the unappealed issue now. Therefore, this court finds that ConsumerInfo is a good faith purchaser of the Domain Name, and that it is entitled to the protections of section 363(m) of the Bankruptcy Code.

Appellants chief argument in response to the findings detailed above is that paragraph 6 of the Sale Order and paragraph 8.1 of the ConsumerInfo APA allows ConsumerInfo to take the Domain Name free and clear of Appellants' defenses only if ConsumerInfo takes title *after* there is a final nonappealable order entered in the Adversary Proceeding. Moreover, Appellants assert that because they are appealing the entire Adversary Proceeding, no final order has been entered and, pursuant to paragraph 8.1 of the ConsumerInfo APA, Appellees waived their §363(m) protections. This court disagrees with Appellants' assertion and characterization of the Sale Order.

Interpreting paragraph 6 of the Sale Order in the manner suggested by Appellants renders paragraph 8 of that same Sale Order a nullity. Paragraph 8 provides: "The transactions contemplated in the Agreement have been negotiated in good faith and at arms length. The Purchaser is entitled to all of the protections of Section 363(m) of the Bankruptcy Code." This court does not believe that the Bankruptcy Court included this provision of the Sale Order by accident. Indeed, this court believes that the language in paragraph 6 of the Sale Order is not a broad waiver of section 363(m) and the protections it provides to a good faith purchaser. Instead, this court believes that paragraph 6 only applies to the period between the Initial Closing and the Subsequent Closing. Once the Judgment was entered in the Adversary Proceeding and there was a subsequent closing, the Trustee and ConsumerInfo were no longer subject to any "defenses" in the

Adversary Proceeding because those defenses were available "pending a ruling of such defenses in the Pending Adversary." Thus, Appellees did not waive their protections under section 363(m).

Based on the foregoing, this court finds that it is statutorily barred by section 363(m) from returning the Domain Name. Thus, this court cannot fashion any appropriate remedy for Appellants, rendering their appeal moot.

## 4. Conclusion

For the reasons stated above, this court finds that Appellants' appeal is moot. Furthermore, this court affirms the Bankruptcy Court's decision with respect to the issues set forth in the cross-appeal. Lastly, if Appellants' appeal is not moot, this court affirms the Bankruptcy Court's findings concerning the issues set forth in the appeal.

DATED this 1st day of February, 2011.

Dee Benson
United States District Judge